IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

FELICIA WILLIAMS,
o/b/o D.W., a minor                                        PLAINTIFF

V.                              NO. 11-1015

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration          DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Felicia Williams, brings this action on behalf of her minor son, D.W.,[1] seeking

judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social

Security Administration (Commissioner) denying D.W.'s application for child's supplemental

security income (SSI) benefits under the provisions of Title XVI of the Social Security Act (Act).

**I.      Procedural Background:**

Plaintiff filed the application for SSI on D.W.'s behalf on May 5, 2005, alleging that

D.W. was disabled due to epilepsy. (Tr. 55-61E, 156).  The Commissioner denied Plaintiff's

application initially and on reconsideration.  (Tr. 32A-46).  On March 27, 2007, the ALJ held a

hearing at which D.W.'s mother and D.W. were represented by counsel and  testified.  (Tr. 299-

329).  On August 20, 2007, the ALJ rendered a decision finding that D.W. was not disabled.  (Tr.

13-23).  On January 26, 2008, the Appeals Council found no basis existed for review of the

ALJ's decision, and thus, the ALJ's decision became the Commissioner's final administrative

decision subject to judicial review.  (Tr. 4-6).

---

[1]Plaintiff's complaint refers to D.W. as the minor.  Although Plaintiff and Defendant referred to the minor as D.T. in their appeal briefs, the Court will refer to the minor as D.W. throughout this opinion.

-1-

On January 26, 2008, Plaintiff filed a civil action in the Western District of Arkansas, and on March 17, 2009, United States Magistrate Judge Barry A. Bryant entered a Memorandum Opinion and Judgment, remanding the case to the Commissioner, based upon a finding that the ALJ did not provide any substantive analysis of the seven factors from 20 C.F.R. § 416.929(c)(3). (Tr. 3F-3G). On June 22, 2009, the ALJ held a supplemental hearing, at which D.W. and his mother testified. (Tr. 384-408). In a written decision dated September 3, 2009, the ALJ found that D.W. had the following severe impairments: seizure disorder; borderline intellectual functioning; and impaired language skills. (Tr. 4G). However, the ALJ further found that as D.W. did not have an impairment or combination of impairments that was medically or functionally equal to a listed impairment, D.W. was not disabled. (Tr. 4G-4S).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on January 29, 2011. (Tr. 3A-3D, 330-332). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have consented to the case being decided by the undersigned. (Doc. 5). Briefs have been filed by the parties and the matter is now ripe for determination. (Docs. 9, 10).

**II.   Evidence Presented:**

D.W. was born in 1996. (Tr. 135). The record reflects that as early as April of 2003, an abnormal EEG was reported and was consistent with primary generalized epilepsy. (Tr. 218). According to a May 27, 2003 record from Family Medical Center, D.W. suffered from the seizures only during his sleep. (Tr. 246). D.W. was placed on Keppra for the seizures. (Tr. 158).

On January 5, 2004, a comprehensive follow-up evaluation was performed at the

-2-

Pediatric Neurology Department, at Arkansas Children's Hospital.  At that time, D.W. was seven years old, and it was reported that D.W. had an onset of seizures "approximately 13 months ago during sleep."  (Tr. 211).  It was also reported that D.W. had never had seizures during wakefulness, and that the seizures "have been controlled on Keppra." (Tr. 211).  The impression given was "Primary generalized epilepsy with nocturnal seizures," and D.W. was advised to continue Keppra at the current dose.  (Tr. 211).

On October 12, 2004, D.W. was referred for a Language Pathology Evaluation at Norphlet Elementary School, where he attended.  (Tr. 190-192).  It was noted that D.W. already received speech and language therapy, and the purpose of the evaluation was to update his current evaluations.  (Tr. 190).  It was reported that the school counselor, Ms. Williams, performed a Systematic Observation of Student Performance on D.W., and she reported that he became easily distracted, and was fidgety and inattentive during the activities.  (Tr. 191).  The impression and recommendation was as follows:

> According to the Arkansas Severity Scale, [D.W.] fell in normal range for articulation, severe range for language, and normal range for voice and fluency.  It is therefore felt that the acquisition of basic cognitive and/or affective performance skills will be affected due [to] his language delay. The committee will look at these evaluation results and the results of his comprehensive evaluation to determine his least restrictive environments.

(Tr. 192).  An Arkansas Severity Rating Scale, dated October 13, 2004, revealed that D.W. had normal articulation components; severe language components; normal voice components; and normal fluency components.  (Tr. 193).

On October 25, 2004, an Occupational Therapy Evaluation was conducted, and it was found that based on standard scores, D.W.'s Visual Motor Integration standard score of 54

-3-

indicated a very low performance compared to his peers, his pure visual standard score of 60 was very low performance, and his pure motor score of 77 was a low performance, compared to his peers. (Tr. 195).

On October 26, 2004, when D.W. was in the first grade, a Comprehensive Evaluation was conducted by Bawana Hooper, Educational Examiner with Norphlet Public Schools, pursuant to a committee recommendation. (Tr. 182). No medical concerns were noted. (Tr. 182). D.W. was observed by counselor Shannon Williams during a reading lesson, who reported that D.W. was easily distracted and fidgety. (Tr. 182). During the testing session, it was reported that rapport was easily established with D.W., but that his attention "was drawn back to the task at hand" on several occasions. (Tr. 182). It was also reported that directions were repeated and clarified on most of the activities, and that when answering verbal questions, D.W. would often give an answer that was not related to the question. (Tr. 182). On the screening inventory completed by the teacher, poor communication skills, poor handwriting, and inattentiveness were noted. (Tr. 183). The "Brigance Inventory of Basic Skills" section revealed that D.W. was below pre-primer in word recognition; below pre-primer in oral reading; below first grade level in listening vocabulary and comprehension; below first grade in spelling; and below first grade in math placement. (Tr. 183). It was further reported that D.W.'s verbal intelligence and composite intelligence index were in the "extremely low range," and that his nonverbal intelligence and composite memory indexes were in the borderline range. (Tr. 184). In the summary, it was reported that D.W. could write and recognize all of the letters and numbers to 10, could count objects, had difficulty with new concepts, and that it took much repetition for D.W. to grasp new concepts. (Tr. 188). It was also reported that D.W.'s measured

-4-

intellectual ability was in the extremely low to borderline range, his achievement scores were within that same range, and that poor verbal comprehension skills may adversely affect all academic areas in the classroom.  (Tr. 188).

On January 5, 2005, a Norphlet Public Schools Evaluation/Programming Conference Decision Form, Ages 5-21, was completed.  (Tr. 173-174).  In the form, it was reported that D.W. was in the first grade and repeated kindergarten, and had been receiving regular classroom instruction with modifications, along with speech therapy.  (Tr. 173).  With respect to his individual intelligence, his RAIS Verbal IQ was <40;  Nonverbal IQ: 73; Composite IQ: 49; and Composite Memory: 73, "placing him in the extremely low range of intellectual ability for verbal and composite IQ." (Tr. 173).  His nonverbal IQ and memory indexes were reported as being in the borderline range.  (Tr. 173).  It was also reported that D.W.'s adaptive skills were low in communication, daily living, and moderately low in socialization.  (Tr. 173). It was reported that the evaluation data substantiated the existence of a disability consistent with state and federal regulations implementing IDEA (Individuals with Disabilities Education Act), and D.W. was determined to have the disability of Mental Retardation.  (Tr. 173).  It was further found that D.W.'s deficits in reading, written expression, and math adversely affected his academic performance in the general curriculum, that he would not make adequate progress without special education services, and that his deficits in adaptive behavior, such as social skills and daily living skills, needed to be addressed in the resource setting.  (Tr. 174).  It was recommended that D.W. receive specialized instruction for math and written expression for 30 minutes daily, reading indirect services, language therapy for 60 minutes and occupational therapy for 75 minutes weekly, and that he would no longer receive articulation therapy, due to a delay no longer being

-5-

present.  (Tr. 174).

On April 20, 2005, a comprehensive follow-up evaluation was performed at the Pediatric Neurology Department at Arkansas Children's Hospital.  (Tr. 205, 230).  It was reported that D.W. was 8 years old, with an onset of seizures approximately at six years of age during sleep, and that he had never had seizures during wakefulness.  (Tr. 205).  It was also reported that his seizures had been controlled on Keppra for more than two years, and that there were no problems in response to the Keppra, except some mild anger issues and weight gain.  (Tr. 205).  The impression given was "Primary generalized evs. partial epilepsy with nocturnal seizures. Previous EEG revealed generalized spike wave but the EEG today revealed left frontal spikes." (Tr. 205).  D.W. was to continue Keppra at the current dose, and add pryidoxine at 100 mg. to see if his behavior might improve.  (Tr. 205).

On May, 2, 2005, Dr. Gregory B. Sharp, of Arkansas Children's Hospital, noted that D.W.'s EEG was abnormal, and that there was a potentially epileptogenic[2] focus localized in the left frontal lobe.  (Tr. 203).

On June 25, 2005, D.W.'s mother completed a Statement of Claimant or Other Person. (Tr. 98-99).  She reported that D.W. had seizures in his sleep, and that the last attack was in April.  (Tr. 98-99).  She reported that he had not had a seizure in the past month "as long as he takes his medicine."  (Tr. 99).  She further reported that D.W. took Keppra twice daily.  (Tr. 99).

On June 25, 2005, Christie Williams, who lived with D.W. and his family, completed a Statement of Claimant or Other Person, stating that she had seen D.W. have his "spells," and that the last one was two years ago.  (Tr. 100).  She reported he had none in the past year.  Similar

---

[2]Epileptogenic - Producing epileptic attacks.  Dorland's Illustrated Medical Dictionary 641 (31st ed. 2007).

statements of Ruby Steward and Pamela Marshall were given.  (Tr. 102, 104).

On June 27, 2005, Dr. Jerry Grant completed a Treating Physician's Report for Seizure Disorder.  (Tr. 231).  In the form, Dr. Grant reported that D.W. shook and foamed at the mouth, only during his sleep, that he had one per month, and that he had seen D.W. four times in the past year, with no seizure activity reported.  (Tr. 231).  He further reported that the date of the most recent reported seizure was on April of 2005.  (Tr. 231).  Dr. Grant reported that D.W. was on Keppra 500 mg., which was started two years previously, and was adjusted 1 ½ years previously. He reported no seizures since the medication was adjusted.  (Tr. 231).[3]

On September 22, 2005, Charles M. Spellmann, Ph.D., of Kenneth B. Robinson M.S. Counseling and Consulting Services, evaluated D.W. upon referral by the Social Security Administration.  (Tr. 252-255).  Dr. Spellman found D.W. to be neatly attired and well groomed, and that his behavior was acceptable, although he found D.W. to be guarded in his manner of interaction with him.  (Tr. 252).  He reported that D.W. could act "incredulous" at being asked some questions and then become sullen or silly, and that there were even some times when "he faked crying and sobbing."  (Tr. 252).  Dr. Spellman further reported that D.W. was not very spontaneous in the testing situation, and was rather passive in his involvement.  He found that D.W. gave some responses which were suspicious in nature with regard to honesty and effort. (Tr. 252).  Dr. Spellman reported that D.W.'s mother said D.W.'s seizures occurred in his sleep, and that he still had them in spite of taking the medication.  (Tr. 253).  Dr. Spellman reported that he did not believe D.W. was open and honest.  (Tr. 253).  D.W.'s verbal IQ was reported as

---

[3] The Court notes that Dr. Grant's report that D.T. had reported no seizures in his four visits in the past year is inconsistent with Dr. Grant's report that the date of the most reported seizure was April of 2005.

55; his performance IQ as 55, and his full scale IQ as 51, which would indicate that D.W. was functioning within the mild range of mental retardation. (Tr. 253). However, Dr. Spellman found these results to be invalid. (Tr. 253). He reported that D.W. did not concentrate or focus well, and his persistence and pace were quite poor, but he did not see enough evidence of serious adaptive weaknesses. (Tr. 254). He did not believe D.W. was functioning in the mental retardation range and reported that D.W. did not give a clear picture of his abilities in terms of intelligence or academic achievement. (Tr. 254-255). Dr. Spellman reported that D.W. appeared immature and manipulative, and that school records might be helpful in providing insight to the question of his capabilities. (Tr. 255). He reported that D.W.'s IQ scores were suspected to be significantly below his actual ability level, but it was difficult to determine. (Tr. 253). He elaborated:

> Results from the WRAT-III may give some clue to his abilities. Even though he clearly did not do his best, he was still able to obtain scores which were considerably higher than one would expect based on IQ scores. I suspect that [D.W.] is functioning at least in the Borderline (IQ 70-79) range of intelligence. His ability to communicate seemed to support this as well.

(Tr. 253). Dr. Spellman believed D.W. was capable of benefitting from classroom instruction. (Tr. 255).

On September 27, 2005, a Childhood Disability Evaluation Form was completed by non-examining consultant Dr. S. A. Whaley. (Tr. 266-271). In the form, Dr. Whaley found D.W. to have impairments of borderline intellectual functioning and seizure disorder, but found that they did not meet, medically equal, or functionally equal the listings. (Tr. 266). She then analyzed the six domains as follows:

-8-

1. Acquiring and Using Information - less than marked
2. Attending and Completing Tasks - less than marked
3. Interacting and Relating with Others - less than marked
4. Moving About and Manipulating Objects - no limitation
5. Caring For Yourself - no limitation
6. Health and Physical Well-Being - less than marked

Tr. 268-269).  Dr. Whaley found that D.W.'s intelligence was an underestimate due to his effort;

that although the psychometric evaluation reflected significant concentration, persistence and

pace deficits, D.W.'s effort was poor;  that D.W. appeared to communicate effectively; that D.W.

reportedly made friends easily and maintained friendships, but did not share well;  and that D.W.

had minor motor seizure disorder which was "well below meet frequency."  (Tr. 268-269).

On October 25, 2005, Dr. Jerry H. Grant saw D.W. for a follow-up on his weight, and

referred D.W. to the Arkansas Children's Hospital for his weight.  (Tr. 226).

On November 29, 2005, a brain MRI with/without contrast, was performed at Arkansas

Children's Hospital.  (Tr. 198, 202).  The impression was: .07 mm. mass involving the right

posterior medial thalamus.  There was no pathologic enhancement, edema, or mass effect

associated with this abnormality, but a small tumor could not be excluded.  Follow up scans were

recommended, and the remainder of the examination was unremarkable.  (Tr. 198).   On that

same date, it was reported that D.W. had never had seizures during wakefulness, and that his

seizures had been controlled on Keppra for more than two years, until he had a light seizure

during sleep on November 20, 2005.  (Tr. 200).  The impression was:

> Primary generalized evs. partial epilepsy with nocturnal seizures.
> Previous EEG revealed generalized spike wave but most recent EEG
> revealed left frontal spikes.  MRI brain today is within normal limits
> except for a small 0.7 cm mass within the right posterior medial thalamus
> with no mass effect, edema, or enhancement.

-9-

(Tr. 200).

On March 17, 2006, D.W. presented to the Fitness Clinic at Arkansas Children's Hospital for "evaluation of overweight." (Tr. 196-197). The impression was:

> (1) Overweight - it does sound like the Keppra did cause a side effect of increased appetite that in turn increased his weight. He also is a somewhat sedentary young man which may be a side effect of him being somewhat developmentally delayed.
> (2) Seizure disorder
> (3) Developmentally delayed and in special education
> (4) Constipation

(Tr. 197).

In March of 2006, D.W.'s mother completed a Statement of Claimant or Other Person. (Tr. 83-84). She reported that the last seizure attack D.W. had was in November 20, 2005, that he had "From 3 to 4" in the past month, and "Round about 9 to 10" in the past year. (Tr. 83-84). Three other similar statements were given by Norma Jean Keel, Pamela Marshal, and Christie Williams. (Tr. 85-90).

On April 6, 2006, Dr. Spellman conducted another Intellectual Assessment and Evaluation of Adaptive Functioning. (Tr. 247-250). Dr. Spellman reported that D.W. came to the appointment neatly and appropriately attired, and that his grooming and hygiene appeared to be satisfactory. (Tr. 247). D.W. was well behaved, but "came across as guarded in his manner of interaction." (Tr. 247). Dr. Spellman found that D.W.'s test behavior was not satisfactory, in that he was clearly not doing his best. (Tr. 247). Dr. Spellman reported that D.W. took a long time in verbal and motor responding, and that this came across as an attempt to avoid giving correct answers and solutions. D.W. also did not respond well to encouragement or confrontation. (Tr. 247). D.W.'s mother reported that D.W. cooperated with teachers and tried

-10-

to do well, and that his latest report card contained D's and C's. (Tr. 247). She also reported that D.W. had "An attitude" when he ran into difficulty with his schoolwork. She reported that she still found D.W. "jerking" and that episodes occurred nightly, sometimes "twice more" each night. (Tr. 248). Dr. Spellman found that D.W. did not come across as either open or honest during the testing session, and seemed to be putting effort into giving incorrect or incomplete responses and resolutions. (Tr. 248). D.W.'s verbal IQ was reported as 55, his performance IQ as 54, and full scale IQ as 50, which indicated that D.W. was functioning within the moderate range of mental retardation. However, Dr. Spellman found the estimate was "most likely not a good indication of D.W.'s abilities." He further reported:

> I considered discontinuing testing, but by the time I came to the conclusion that [D.W.] was malingering, I had already administered half of the instrument. Had his scores been higher in the mental retardation category (65-69) I might not as strongly suspected malingering. However, scores obtained from the WISC-III seemed to be totally out of character with this child's ability to communicate as well as some of his scores on the WRAT-III. Achievement estimates from the WRAT-III indicate below grade level operations in reading and spelling. However, only the reading score falls in the deficit range. The spelling score falls in the "slow learner" range of achievement. Arithmetic scores indicate average abilities. This is in stark contrast to his performance on the Arithmetic subtest of the WISC-III. The achievement scores certainly do not appear to correlate well with a Mental Retardation diagnosis, especially with IQ scores as low as [D.W]. obtained on the test date. In consideration of all test results and observations, I believe that [D.W.] is most likely functioning at least within the Borderline range of intelligence (IQ 70 to 79).

(Tr. 248). Dr. Spellman further reported that D.W. did not give a good demonstration in the area of concentration, persistence and pace, which was seen as an attempt to avoid doing well without looking to be insincere. (Tr. 249). D.W.'s mother told Dr. Spellman that D.W. got along pretty well with other children, and that D.W. seemed to display a rather high level of dependency on

-11-

her. (Tr. 249). D.W.'s mother also reported that D.W. could not button a shirt well and wanted assistance zipping his pants. However, Dr. Spellman reported that D.W. could zip his pants at school, and D.W.'s mother thought D.W. just wanted to be spoiled. (Tr. 249). She also reported that D.W. tried with household chores, "but he can't do it right." (Tr. 249). Dr. Spellman did not believe there was enough reliable information to firmly establish the existence of significant deficits in adaptive functioning, and that although his mother reported some immaturity in self-help, this appeared to be attention seeking in terms of motivation. (Tr. 250). Dr. Spellman concluded that he believed D.W. had the intellectual capacity to benefit from classroom instruction, although he did not rule out intellectual ability being in the "slow learner" range. (Tr. 250). He acknowledged that D.W. may have difficulty at grade level in a regular classroom setting without some fairly significant accommodations being made in the presentation of materials and test taking. (Tr. 250).

On April 12, 2006, a Teacher questionnaire was completed by Beth Barnfardt, D.W.'s second grade teacher. In analyzing the six domains, Teacher Barnfardt reported that in Acquiring and Using Information, D.W. had "A very serious problem" in all categories except one, where he had "A serious problem." (Tr. 62). In Attending and Completing Tasks, she reported that D.W. had "A very serious problem" carrying out multi-step instructions and completing work accurately, without careless mistakes; "A serious problem" paying attention when spoken to directly, focusing long enough to finish assigned activity or tasks; completing class/homework assignments, working without distracting self or others, and working at reasonable pace/finishing on time; "An obvious problem" sustaining attention during play/sports activities, refocusing to task when necessary; and "A slight problem" waiting to take turns and changing from one

-12-

activity to another without being disruptive.  (Tr. 63).  In Interacting and Relating with Others, Teacher Barnfardt indicated D.W. had "An obvious problem", "A slight problem" or "No problem" in this category.  (Tr. 64).  In Moving About and Manipulating Objects, Teacher Barnfardt found D.W. had only "A slight problem," or "No problem" in this category.  (Tr. 65). In Caring for Himself, Teacher Barnfardt found D.W. had "An obvious problem," "A slight problem," and "No problem" in this category.  (Tr. 66).  With respect to Medical Conditions and Medications/Health and Physical Well-Being, Teacher Barnfardt reported having no knowledge in this category.  (Tr. 67).

On April 17, 2006, in a social security form, it was reported that D.W.'s articulative skills were within normal limits, and that he exhibited a receptive/expressive language delay.  (Tr. 257).

On April 25, 2006, a Childhood Disability Evaluation Form was completed by non-examining consultant Susan Manley, M.D. (Tr. 258-261).  Dr. Manley found that D.W. suffered from an impairment or combination of impairments that were severe - borderline intellectual functioning and seizure disorder, but that they did not meet, medically equal, or functionally equal the listings.  (Tr. 258).  She analyzed the relevant domain functions as follows:

1. Acquiring and Using Information - less than marked
2. Attending and Completing Tasks - less than marked
3. Interacting and Relating with Others - less than marked
4. Moving about and Manipulating objects - no limitation
5. Caring For Yourself - no limitation
6. Health and Physical Well-Being - less than marked.

(Tr. 260-261).  Dr. Manley noted that although D.W. had tested in the mental retardation range at two consultative examinations, she found neither of them were considered valid due to poor

-13-

effort.  She found that D.W.'s estimated intellectual functioning was in the borderline range.  Dr. Manley noted that D.W.'s teacher reported quite serious learning problems, but other than some attention problems, D.W. functioned well in the classroom, consistent with adaptive behavior reported by the consultative examiner.  (Tr. 260).

On November 29, 2006, a follow-up evaluation by the Pediatric Neurology Department, at Arkansas Children's Hospital, indicated that D.W. had one seizure since his visit six months previously that occurred during wakefulness and was focal, primarily involving his right arm. (Tr. 294).  The impression was partial epilepsy.  (Tr. 294).

A March 2007 CTAAP Performance Profile for D.W. reflects very low scores by D.W. (Tr. 181).

On March 20, 2007, Christie Williams wrote a letter "ToWhom It May Concern," reporting that she made sure D.W. took his medicine in the morning, and that she often saw him have 3-4 light seizures in his sleep.  (Tr. 179).

A May 22, 2007 report card revealed that D.W. made all A's, B's, and C's, and that he was taking special education classes in math, reading, and language.  (Tr. 180).

A June 8, 2007 MRI of D.W.'s brain with/without contrast revealed a "stable small 5-6 mm lesion involving the posteromedial right thalamus."  (Tr. 373).  The lesion was reported as appearing "stable to slightly less conspicuous when compared to prior exams dating back to 11/29/05."  (Tr. 373).

An October 16, 2008 MRI of D.W.'s brain with/without contrast revealed "Previously seen abnormal signal in the right medial thalamus is no longer seen.  No evidence of any abnormal enhancement or restricted diffusion."  (Tr. 377).

AO72A
(Rev. 8/82)

An Occupational Therapy Year End Report dated May 5, 2009, indicated that D.W. met three out of four annual goals and five out of ten short term objectives. It was recommended that D.W. continue with occupational therapy services for "visual perception, visual motor, motor skills, and sensory processing." (Tr. 360). It was also noted in a May 5, 2009 report that D.W. needed small group instruction to complete his academic and functional goals and objectives. (Tr. 367).

D.W.'s 2009 report card (D.W. was in the 5th grade) revealed that D.W. was making A's, B's, and C's. (Tr. 371).

On June 25, 2009, after D.W. had been taken off Keppra by his physician for about one month, D.W. was taken to the emergency room at Medical Center of South Arkansas, where it was reported that on that day, while playing basketball, D.W. collapsed and started to have a tonic-clinic seizure.[4] (Tr. 378-381).

At the March 27, 2007 hearing, D.W.'s mother testified that D.W. had been suspended "off the bus" two separate times. (Tr. 312). She also testified that when D.W. was home, he played video games. (Tr. 314). She stated that D.W. had learned how to button his shirts, and had a speech problem, but that he had a "very good attitude about things." (Tr. 322). She said D.W. loved being around children and was good with them. (Tr. 322).

At the June 22, 2009 hearing before the ALJ, D.W. reported that he liked school and his teachers and that he was doing "okay" in school. (Tr. 388). D.W. stated that he was playing football and a flute in music class, and that he was not having seizures. He reported not taking

---

[4]Tonic-clinic - Tonicclonic. Id. at 1962.
 Tonicclonic - Both tonic and clonic; said of a spasm or seizure consisting of a convulsive twitching of the
  muscles. Called also *tonic-clinic* and *tonoclonic*. Id.

AO72A
(Rev. 8/82)

any medicine.  D.W.'s mother testified that D.W. did not "comprehend with the other kids," and that he had an "attitude with the teachers," and had been in a couple of fights.  He had received in-school suspension for not going to class, and his mother grounded him.  (Tr. 398).  She also testified that sometimes he called her to help him wipe himself when he used the toilet.  (Tr. 402).  D.W.'s mother testified that Dr. Sharp wanted to wean D.W. off of his medicine, and that D.W. quit taking Keppra three weeks prior thereto.  Dr. Sharp told Plaintiff that the seizures might come back, but that they were thankful that they had not come back at that time.  (Tr. 399).

### III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

The regulations prescribe a three-step process for making the disability determination.  First, the ALJ must determine whether the child has engaged in substantial gainful activity.  See

-16-

20 C.F.R. 416.924(b). Second, the ALJ must determine whether the child has a severe impairment or combination of impairments. See 20 C.F.R. 416.924(c). Third, the ALJ must determine whether the severe impairment(s) meets, medically equals, or functionally equals a listed impairment. See 20 C.F.R. § 416.924(d). Functional equivalence may be established by demonstrating marked limitations in two, or extreme limitations[5] in one of the following "domains:" 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well-being. See 20 C.F.R. § § 416.926(b)(1), 416.926a(d). The ALJ should consider all relevant evidence in the case to determine whether a child is disabled, and the evidence may come from acceptable medical sources and from a wide variety of "other sources," including teachers. SSR 09-2P. In fact, the Commissioner's regulations for childhood disabilities "provide that parents and teachers, as well as medical providers, are important sources of information." Lawson v. Astrue, 2009 WL 2143754, at *9 (E.D. Mo. July 13, 2009), citing 20 C.F.R. § 416.9249.

In the present case, the ALJ found that D.W.'s claim failed at step three, as D.W. did not

---

[5]((2)Marked limitation -(I)We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.... (3)Extreme limitation - (I) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § § 416.926a(e)(2) and (3).

-17-

have an impairment that met or medically equaled a listed impairment. The ALJ specifically stated that he found no evidence to show the existence of any physical and/or mental impairment(s) that met the criteria of 111.03, 112.05, and 102.08, or any other of the listed impairments described in Appendix 1 of the Regulations. (Tr. 4G). The ALJ also determined that D.W. did not have an impairment or combination of impairments that functionally equaled the listings. (Tr. 4H).

Plaintiff argues the following in this appeal: 1) That D.W.'s seizure disorder meets child's listing 111.03, Neurological (20 C.F.R. pt. 404, subpt P, App. 1; and 2) That D.W. has an impairment or combination of impairments functionally equal to the child's listing 112.05 mental retardation. (Doc. 9 at p. 3).

## IV.   Discussion:

### A.   Whether D.W.'s Seizure Disorder meets listing 111.03:

The ALJ found no evidence to show the existence of any physical and/or mental impairment(s) that meets the criteria of 111.03, 112.05, or 102.08. Listing 111.03 provides:

> 111.03 - Nonconvulsive epilepsy. In a child with an established seizure disorder, the occurrence of more than one minor motor seizure per week, with alteration of awareness on loss of consciousness, despite at least three months of prescribed treatment.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

As reported earlier, in January of 2004, at a follow up visit with the Pediatric Neurology Department at Arkansas Children's Hospital, D.W.'s seizures were reported as occurring only during sleep, and were controlled by Keppra. (Tr. 211). On April 20, 2005, the Pediatric

-18-

Neurology Department reported that D.W. had never had seizures during wakefulness, and that the seizures had been controlled on Keppra for more than two years. (Tr. 205). On November 29, 2005, the Pediatric Neurology Department reported again that D.W. had never had seizures during wakefulness, and that his seizures had been controlled on Keppra for more than two years, until he had a light seizure during his sleep on November 20, 2005. (Tr. 200). On November 29, 2006, the Pediatric Neurology Department reported that D.W. had one seizure since his visit six months prior thereto, which occurred during wakefulness and was focal, primarily involving his right arm. (Tr. 294).

At D.W's first hearing, held on March 27, 2007, D.W.'s mother reported that D.W. had seizures during his sleep three to four times a week, and that he sometimes would wet on himself. (Tr. 309-310). She testified that she had not seen one during the daytime. (Tr. 310). She further reported that D.W. had an MRI every six months at Arkansas Children's Hospital, to see if the seizures were "still going on in his brains." (Tr. 320). She testified that he would not have seizures every month. (Tr. 320). She reported that at his aunt's birthday party, D.W. got too hot playing with the other children, and had a "very light" seizure. (Tr. 321). She further testified that in 2006 he started having seizures again. (Tr. 323). At D.W.'s second hearing, held on June 22, 2009, D.W. testified that he was not having little seizures and shakes at night, and that he was not taking any medicine. (Tr. 392). D.W.'s mother testified that Dr. Sharp wanted to wean D.W. off of his Keppra and that he had not taken it for three weeks. She further testified, and D.W.'s testimony confirms, that D.W. was playing school football, and a plastic flute in music class. D.W.'s 2009 report card revealed he was making A's, B's and C's. (Tr. 371). It is true that on June 25, 2009, three days after the hearing, D.W. was taken to the

-19-

emergency room after having suffered a seizure while playing basketball.  However, it is clear that at the time of this seizure, D.W. was not taking his Keppra, which had previously pretty well controlled D.W.'s seizures.  Conditions controlled with diet and medication are not medically severe.  See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).  Further, even though D.W.'s mother testified about more frequent seizure activity, and described daily seizure activity to Dr. Spellman, she was apparently not reporting this frequency to the Pediatric Neurology Department, which caused the ALJ to question her credibility.  See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)(the ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole).

Although D.W.'s mother reported that after his nocturnal seizures, D.W. was very tired and sleepy, there is nothing to indicate that the mild nocturnal seizures from which D.W. suffered significantly interfered with his activities during the day.  On the contrary, D.W. participated in sports, music, regular and special education classes, made friends easily, and made good grades in school, having only been retained for his kindergarten year.  D.W.'s mother stated that she had no discipline problems with D.W, and that he was a "good child."  (Tr. 321).  Accordingly, the Court finds there is substantial evidence to support the ALJ's findings that D.W.'s impairments did not meet or medically equal Listing 111.03.

**B.  Whether D.W. Had an Impairment that was Functionally Equivalent in Severity to a Listed Impairment:**

Listing 112.05 provides that mental retardation is characterized by "significantly subaverage general intellectual functioning with deficits in adaptive functioning."  20 C.F.R. Pt.

-20-

404, Supt. P., App. 1.  It further provides that the required level of severity of this disorder is met when the requirements in A., B., C.,  D.,  E., or F. are satisfied:

A. [not applicable to this case]

OR

B.  Mental incapacity evidenced by dependence upon others for personal needs (grossly in excess of age-appropriate dependence) and inability to follow directions such that the use of standardized measures of intellectual functioning is precluded;

OR

C.  A valid verbal, performance, or full scale IQ of 59 or less;

OR

D  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;

OR

E.  A valid verbal, performance, or full scale IQ of 60 through 70, and:

1. [not applicable in this case]

2.  For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d or 112.02;

OR

F.  Select the appropriate age group:

1. [not applicable in this case]

2.  For children (age 3 to attainment of age 18), resulting in the satisfaction of 112.02B2a, and a physical or other mental impairment imposing an additional and significant limitation of function.

20 C.F.R. Pt. 404, Supt. P., App. 1.

Plaintiff argues that D.W. had a verbal IQ of 55, performance IQ of 55, and full scale IQ of 51, and that when Dr. Spellman tested D.W. again on April 6, 2006, he had a verbal IQ of 55, performance IQ of 54, and a full scale IQ of 50.  (Doc. 9 at p. 6).  Thus, Plaintiff argues that the school records and Dr. Spellman's testing "preponderate heavily in favor of this Plaintiff and his

-21-

credibility." (Doc. 9 at p. 7). Plaintiff questions how a nine year old could "malinger" as was found by Dr. Spellman, and asserts that D.W. had serious problems unappreciated by Dr. Spellman. Plaintiff argues that D.W. had one domain of "extreme" and another of at least "marked."

With respect to D.W.'s IQ, it is true that his IQ score, when tested by Dr. Spellman, indicated mild and moderate ranges of mental retardation. However, it is noteworthy that Dr. Spellman concluded at the first testing in 2005 that the test results were not valid, and that he did not see enough evidence of serious adaptive weaknesses. (Tr. 254). Dr. Spellman also noted that he did not believe D.W. was functioning in the mental retardation range, but rather that he believed D.W. was capable of benefitting from classroom instruction. At the second test in 2006, Dr. Spellman again concluded that D.W.'s test behavior was not adequate, and that although the results indicated that D.W. was functioning within the moderate range of mental retardation, it was most likely not a good indication of D.W.'s abilities. In fact, Dr. Spellman considered discontinuing the testing since the achievement scores did not appear to correlate well with a mental retardation diagnosis, especially with IQ scores as low as D.W. obtained on the test date. Dr. Spellman believed that D.W. was most likely functioning at least within the borderline range of intelligence. (IQ 70 to 79). (Tr. 248). Dr. Spellman believed D.W. had the intellectual capacity to benefit from classroom instruction.

An IQ test is not the only evidence which may be examined. See Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004). Other information which indicates an individual's ability to function can be used to discredit results of an IQ test, and the ALJ may reject IQ scores if they are inconsistent with the rest of the record. Id.

Plaintiff refers to the School Assessment dated January 5, 2005, titled "Evaluation/Programming Conference Decision Form, Ages 5-21," completed when D.W. was in the first grade. (Tr. 173-174). This form appears to have been completed to determine whether D.W. was eligible for special education services, under the IDEA (Individuals with Disabilities Education Act). In the evaluation, it was reported that D.W.'s "visual motor integration standard score 54, pure visual SS 60, pure motor SS 72 - scored very low performance compared to his peers." (Tr. 173). It also appears that the results used at the evaluation were based upon results given in an Occupational Therapy Evaluation of October of 2004. (Tr. 194). The evaluation committee determined that this evaluation data substantiated the existence of a disability consistent with state and federal regulations implementing IDEA, and that D.W. had been determined to have the disability of mental retardation. Special education and related services were recommended as follows:

> Specialized instruction for math and written expression for 30 minutes daily, reading indirect services, language therapy for 60 minutes and occupational therapy for 75 minutes weekly. He will no longer receive articulation therapy due to a delay no longer being present.

(Tr. 174).

The regulations provide that the IQ scores in Listing 112.05 "reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15, e.g., the Wechsler series." See 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(d)(9). As stated by Defendant, the regulations also provide that generally, it is preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(d)(15). In addition, IQ test results must also be sufficiently current for

-23-

accurate assessment under 112.05. Id. at § 112.00(d)(10).[6]  The Court agrees with Defendant that Plaintiff has not demonstrated that the VMI is an IQ score that reflects values of general intelligence, or that it satisfies the regulatory criteria of having a mean of 100 and a standard deviation of 15.  The Wechsler series is an accepted IQ test, and although D.W. scored below 59 on the Wechsler tests, when Dr. Spellman administered them, Dr. Spellman felt them to be invalid and not reflective of D.W.'s actual IQ.   See Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 689 (8th Cir. 2005)(court noted that Plaintiff ignored fact that both doctors' diagnoses of mild mental retardation were only based on her IQ scores and both doctors opined scores were not accurate reflections of her intelligence level or cognitive ability).  The Court finds that the ALJ's conclusion that D.W. suffered from Borderline Intellectual Functioning rather than Mental Retardation is supported by substantial evidence.

Plaintiff next argues that D.W.'s impairment or combination of impairments resulted in an "extreme" limitation in one domain and at least a "marked" limitation in another domain.  Plaintiff challenges the ALJ's finding in only two of the six domains: Acquiring and Using Information, and Attending and Completing Tasks.  The ALJ found that D.W. had less than marked limitation in acquiring and using information, and a less than marked limitation in attending and completing tasks.

The only Teacher Questionnaire before the ALJ and the undersigned is the one completed by Teacher Barnfardt (D.W.'s second grade teacher), on April 12, 2006.  In the questionnaire, as to "Acquiring and Using Information," Teacher Barnfardt reported that D.W. had "A very

---

[6]"Generally, the results of IQ tests tend to stabilize by the age of 16. ...IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. ..."  20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(d)(1).

serious problem" in all categories except one, where she found he had "A serious problem."

With respect to "Attending and Completing Tasks," Teacher Barnhart reported that D.W. had

"A serious problem" in five out of 13 categories.[7]  (Tr. 62-63).  Not only are these conclusions

inconsistent with Dr. Spellman's evaluations, but they are also inconsistent with the opinions of

non-examining Dr. S.A. Whaley and Dr. Susan Manley, wherein they found that D.W. had less

than marked limitation in his ability to acquire and use information, and less than marked

limitation in his ability to attend and complete tasks.  The ALJ in this case addressed Teacher

Barnfardt's evaluation regarding D.W.'s ability to acquire and use information, and placed more

emphasis on Dr. Spellman's conclusion that D.W. was a malingerer.  With respect to attending

and completing tasks, the ALJ noted that D.W. was able to play video games for 2-3 hours a day

and 10 hours a day on weekends.  (Tr. 4N, 196).  The  ALJ was not obliged to credit the

assessment by D.W.'s teacher over the opinions of the doctors, particularly Dr. Spellman, who

examined D.W. twice.  See England v. Astrue, 490 F.3d 1017, 1022 (8th Cir. 2007)(holding that

although the ALJ did not discuss teachers' evaluations, his failure to cite specific evidence did

not indicate it was not considered, and the court was not persuaded that the ALJ was obliged to

credit the assessments by the claimant's teachers over the opinions of the doctors).

In addition, it is clear that by 2009, D.W. had improved considerably in his ability to

acquire and use information and attend and complete tasks, as is evidenced by the fact that he

received A's, B's, and C's in the fifth grade, liked school and his teachers, played football in the

fourth and fifth grades, and played a plastic flute in music class.  The fact that D.W. evidently

progressed though school while taking at least some general education classes constitutes some

---

[7]The Court notes that Teacher Barnfardt reported no serious or very serious problems in the remaining four
domains, and there is therefore no need to address the remaining domains.  (Tr. 64-67).

-25-

support for the ALJ's conclusion.  See id.  The Court finds there is substantial evidence to support the fact that D.W. did not experience deficits in adaptive functioning, as required by the listing.

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's findings that D.W.'s seizure disorder did not meet Listing 111.03; that D.W. did not have an impairment or combination of impairments that met or medically equaled any listed impairment; and that the ALJ properly addressed Judge Bryant's remand directives.

**V.    Conclusion**

Accordingly, the Court hereby finds, after considering all the relevant evidence in the record, that there is substantial evidence to support the ALJ's findings and conclusions. Accordingly, the Court hereby affirms the ALJ's decision and dismisses Plaintiff's case with prejudice.

IT IS SO ORDERED this 24th day of April, 2012.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-26-